# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
### ELKINS

**CAROLYN DOBBINS,**

        **Plaintiff,**

**v.**                             **Civil Action No.: 2:09-CV-108**
                                       **JUDGE MAXWELL**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

        **Defendant.**

## REPORT AND RECOMMENDATION TO THE DISTRICT JUDGE RECOMMENDING THAT THE DISTRICT COURT GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [13], DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [10], AND AFFIRM THE DECISION OF THE ADMINISTRATIVE LAW JUDGE

## I.     INTRODUCTION

On September 4, 2009, Plaintiff Carolyn Dobbins ("Plaintiff"), by counsel Montie VanNostrand, Esq., filed a complaint in this Court to obtain judicial review of the final decision of Defendant Michael J. Astrue, Commissioner of Social Security ("Commissioner" or "Defendant") pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). On November 10, 2009, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an answer and administrative transcript of the proceedings. On December 10, 2009 and January 8, 2010, Plaintiff and the Commissioner filed their respective Motions for Summary Judgment [10] [13]. Following review of the motions by the parties and the transcript of administrative proceedings, the undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

## II.    RELEVANT PROCEDURAL AND FACTUAL BACKGROUND AND REVIEW OF ADMINISTRATIVE LAW JUDGE DECISION

### A.    Procedural Background

On August 4, 2005, Plaintiff applied for supplemental security income, alleging disability as of June 30, 2004. Tr. at 149. On May 9, 2007, the United States Administrative Law Judge ("ALJ") held a hearing, and Plaintiff testified under oath. Tr. at 51-92. *See* 20 C.F.R. § 404.929 (hearing before an administrative law judge). On May 22, 2007, the ALJ issued an unfavorable decision to Plaintiff, finding her not entitled to a period of disability. Tr. at 40-49. The Appeals Council denied Plaintiff's request for review, which made the ALJ's decision the final decision of the Commissioner. Tr. at 7-9. *See* 20 C.F.R. § 404.967 (Appeals Council review--general); *see also* 20 C.F.R. § 404.981 (Effect of Appeals Council's decision or denial of review). Plaintiff now requests judicial review of the ALJ decision denying her application for disability.

### B.    Standard for Judicial Review of a Decision by the Administrative Law Judge in a Disability Case

Judicial review of a final decision regarding disability benefits is limited to determining whether the findings...are supported by substantial evidence and whether the correct law was applied. *See* 42 U.S.C. § 405(g). "The findings...as to any fact, if supported by substantial evidence, shall be conclusive" *Richardson v. Perales*, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422 (1971); *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). The phrase "supported by substantial evidence" means "such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *See Perales*, 402 U.S. at 401, 91 S. Ct. at 1427 (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 216 (1938))...Substantial evidence...consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance...Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment...if the decision is supported by substantial evidence. *See Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *Snyder v. Ribicoff*, 307 F.2d 518, 529 (4th Cir.1962). Ultimately, it is the duty of the

administrative law judge reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence. *King v. Califano*, 599 F.2d 597, 599 (4th Cir.1979). **"This Court does not find facts or try the case *de novo* when reviewing disability determinations."** *Seacrist v. Weinberger*, 538 F.2d 1054, 1056-57 (4th Cir.1976); "We note that it is the responsibility of the [Commissioner] and not the courts to reconcile inconsistencies in the medical evidence, and that it is the claimant who bears the risk of non-persuasion." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir.1972). "The language of the Social Security Act precludes a *de novo* judicial proceeding and requires that the court uphold the decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'"

*See Hays v. Sullivan*, 907 F.2d 1453 (4th Cir. 1990) (emphasis added). In applying these legal standards, the Court reviews the decision by the ALJ.

### C.    Standard for Disability and Five-Step Evaluation Process

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work..."[W]ork which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

*See* 42 U.S.C. § 423(d)(2)(A). In order for the ALJ to determine whether a plaintiff is disabled and therefore entitled to disability insurance benefits, the Social Security Administration has established a five-step sequential evaluation process. The five steps are as follows (including Residual Functional Capacity Assessment prior to Step Four):

Step One:    Determine whether the plaintiff is engaging in substantial gainful activity;

Step Two:    Determine whether the plaintiff has a severe impairment;

Step Three:     Determine whether the plaintiff has a "listed" impairment;

* Residual Functional Capacity Assessment *
(Needs to be Determined Before Proceeding to Step Four)

Step Four:     Compare residual functional capacity assessment to determine whether the plaintiff can perform past relevant work;

Step Five:     Consider residual functional capacity assessment, age, education, and work experience to determine if the plaintiff can perform any other work.

*See* 20 C.F.R. § 404.1520 (evaluation of disability in general). In following the five-step process and coming to a decision, the ALJ makes findings of fact and conclusions of law. This Court will review the decision by the ALJ to determine whether it is supported by substantial evidence, in accordance with 42 U.S.C. § 405(g) and *Hays*.

## D.     Review of ALJ Application of Five-Step Evaluation Process and Whether it is Supported by Substantial Evidence

### 1.     Step One: Determine whether the Plaintiff is Engaging in Substantial Gainful Activity

Substantial gainful activity is work activity that is both substantial and gainful:

(a) Substantial work activity. Substantial work activity is work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before.

(b) Gainful work activity. Gainful work activity is work activity that you do for pay or profit. Work activity is gainful if it is the kind of work usually done for pay or profit, whether or not a profit is realized....

If you are working or have worked as an employee...[g]enerally, in evaluating your work activity for substantial gainful activity purposes, our primary consideration will be the earnings you derive from the work activity...

> [I]f you are self-employed [w]e will consider your activities and their value to your business to decide whether you have engaged in substantial gainful activity...
>
> If you are working and the work you are doing is substantial gainful activity, we will find that you are not disabled ***regardless of your medical condition*** or your age, education, and work experience.

*See* 20 C.F.R. § 404.1572; *see also* 20 C.F.R. § 404.1574(a) (evaluation guide if you are an employee); *see also* 20 C.F.R. § 404.1575(a)(2) (evaluation guide if you are self-employed); *see also* 20 C.F.R. § 404.1520(b) (emphasis added). The ALJ found that Plaintiff has not engaged in substantial gainful activity at any time relevant to this decision. Tr. at 42. The parties do not dispute ALJ's findings in Step One.

### 2.    Step Two: Determine whether the Plaintiff has a Severe Impairment

> At the second step, we consider the medical severity of your impairment(s)...[A] severe impairment... [is] any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities...We will not consider your age, education, and work experience...
>
> An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities. Basic work activities...mean[s] the abilities and aptitudes necessary to do most jobs. Examples of these include--1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers and usual work situations; and (6) Dealing with changes in a routine work setting.

*See* 20 C.F.R. § 404.1520(c); *see also* 20 C.F.R. § 404.1521; *see also Luckey v. U.S. Dept. of Health & Human Services*, 890 F.2d 666 (4th Cir. 1989). The ALJ found Plaintiff to have the following severe impairments: degenerative disc disease of the thoracic spine, diabetes mellitus, acquired monocular vision, borderline intellectual functioning, personality disorder and affective disorder

(depression / anxiety). Tr. at 42. The parties do not dispute ALJ's findings in Step Two.

### 3. Step Three: Determine whether the Plaintiff has a "Listed" Impairment

> If you have an impairment(s) that meets or equals one of our listings in appendix 1 of [Subpart P of Part 404] and meets the duration requirement, we will find that you are disabled. *See* 20 C.F.R. § 404.1520(d).

> The Listing of Impairments...describes...impairments that we consider to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. *See* 20 C.F.R. § 404.1525(a).

> Most of the listed impairments are permanent or expected to result in death. *See* 20 C.F.R. § 404.1525(a).

> We need evidence from acceptable medical sources (e.g. licensed physicians) to establish whether you have a medically determinable impairment(s). *See* 20 C.F.R. § 404.1513(a).

> To meet the requirements of a listing, you must have a medically determinable impairment(s) that satisfies ***all of the criteria*** in the listing. *See* 20 C.F.R. § 404.1513(a) (emphasis added).

> ***An impairment that manifests only some of those criteria, no matter how severely, does not qualify***. *See Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885 (1990) (emphasis added).

Plaintiff contends that she meets the "C" criteria for listing 12.04 (Affective Disorders) due to evidence of episodes of decompensation and living in a highly structured and directing household. Pl. Doc. 10 at 4-8.

> **12.04 Affective Disorders:** Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation. The required level of severity for these disorders is met when the requirements in both A and B are satisfied, **or when the requirements in C are satisfied...**

> **C. Medically documented history of a chronic affective disorder**

**of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities**, with symptoms or signs currently attenuated by medication or psychosocial support, **and one of the following**: **1.** Repeated episodes of decompensation, each of extended duration; or **2.** A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; **or 3.** Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

*See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04 (Affective Disorders) (emphasis added).

**Need for longitudinal evidence.** Your level of functioning may vary considerably over time. The level of your functioning at a specific time may seem relatively adequate or, conversely, rather poor. Proper evaluation of your impairment(s) must take into account any variations in the level of your functioning in arriving at a determination of severity over time. Thus, it is vital to obtain evidence from relevant sources over a sufficiently long period prior to the date of adjudication to establish your impairment severity...

**Episodes of decompensation** are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by **difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace.** Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two). Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., **hospitalizations, placement in a halfway house, or a highly structured and directing household**); or other relevant information in the record about the existence, severity, and duration of the episode...

Effects of structured settings. Particularly in cases involving chronic mental disorders, overt symptomatology may be controlled or attenuated by psychosocial factors such as **placement in a hospital, halfway house, board and care facility, or other environment that provides similar structure.** Highly structured and supportive

settings may also be found in your home. Such settings may greatly reduce the mental demands placed on you. With lowered mental demands, overt symptoms and signs of the underlying mental disorder may be minimized. At the same time, however, your ability to function outside of such a structured or supportive setting may not have changed. If your symptomatology is controlled or attenuated by psychosocial factors, we must consider your ability to function outside of such highly structured settings. For these reasons, identical paragraph C criteria are included in 12.02, 12.03, and 12.04.

*See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00 (Mental Disorders) (emphasis added).

The ALJ reviewed the record and Plaintiff's daily activities to determine whether she meets the "C" criteria for 12.04 (Affective Disorders). Tr. at 42-48.

a.     **The ALJ Reviewed the Record and Plaintiff's Daily Activities to Determine whether Plaintiff Meets the "C" Criteria for 12.04 (Affective Disorders)**

(1)     **Review of the Record from 2005**

In July 2005, Plaintiff had an evaluation in Braxton County with Sandra R. Rush, M.D. Tr. at 334. Plaintiff's current medications were Trileptal, Seroquel, Zoloft, and Abilify. Tr. at 334. Plaintiff reported that she also has a prescription for Xanax, but she only uses it when she has severe anxiety or panic attacks. Tr. at 334.

On August 4, 2005, Plaintiff applied for supplemental security income, alleging disability as of June 30, 2004 due to depression, diabetes, left eye blindness, and back problems. Tr. at 149 & 167.

On August 16, 2005, Plaintiff completed a disability function report. Tr. at 172-79. She stated that she sleeps most of the day and sometimes tries to clean her house. Tr. at 172. She reported that she does not have any problem with her personal needs and takes care of her husband by cleaning and cooking. Tr. at 173. She said she also does laundry, watches television, and shops

for food and clothing. Tr. at 174-76. She is able to drive, pay bills, and use a checkbook. Tr. at 175. Her hobbies include needlework and crocheting, but she has not been able to do them very often. Tr. at 176. She said she does not have problems getting along with other people or authority figures, and she has never been fired for problems with getting along with people. Tr. at 177-78. Plaintiff said she can pay attention for maybe 30 minutes, and she is good at following written and spoken instructions. Tr. at 177. She said she does not handle stress very well or changes in routine. Tr. at 178.

In October 2005, Plaintiff had a mental status disability examination with Larry J. Legg, M.A., a licensed psychologist. Tr. at 255-60. Plaintiff reported that she is 5 feet 4 inches tall and weighs 250 pounds. Tr. at 255. Plaintiff said she received her high school diploma in Germany while her husband was in the military. Tr. at 256. Plaintiff noted that she had her left eye removed due to cancer when she was 3 years old and now has a prosthetic eye. Tr. at 256. Plaintiff said that in 2000, her depression started when she was taking care of an elderly couple. Tr. at 256. For 14 years, she lived with her husband on the farm of the elderly couple, and she took care of them 24 hours a day, 7 days a week. Tr. at 256. Plaintiff and her husband had to move off the farm when the elderly couple died. Tr. at 256. "I have kind of went down hill since then." Tr. at 256. Plaintiff said she has symptoms of poor concentration, depression, feelings of hopelessness, decreased energy and appetite, increased sleep, and loss of interest in activities. Tr. at 256. Plaintiff said that in 2004, she began receiving community mental health services at the Summit Center in Braxton County. Tr. at 257. Plaintiff reported that she has never been hospitalized for any psychiatric or psychological reasons. Tr. at 257. Plaintiff said that from September 2002 to June 2004, she was employed as a housekeeper at the Days Inn. Tr. at 257. She said she visits friends and family on a regular basis. Tr.

at 258. Plaintiff said she volunteers at Burnsville Elementary in their store and for parties. Tr. at 258. She said she spends most of her day sleeping and watching televison. Tr. at 258.

At the October 2005 mental examination, Psychologist Legg noted that Plaintiff was appropriately dressed and well groomed. Tr. at 258. He found Plaintiff's attitude and behavior to be motivated, cooperative, and polite. Tr. at 258. He found her to be slightly depressed, with a flat affect and normal stream of thought. Tr. at 258. He found her recent memory to be severely deficient since she could recall only one of the four words given to her thirty minutes earlier. Tr. at 258. He found her remote memory as normal based on her ability to recall details of her personal history. Tr. at 258. He found her concentration to be moderately deficient based on a WAIS-III subtest. Tr. at 258. Psychologist Legg found Plaintiff's immediate memory to be normal based on her ability to immediately repeat back a list of four words. Tr. at 258. He found her persistence to be normal because she was able to stay on task during the mental status examination. Tr. at 258. Psychologist Legg found Plaintiff's pace to be mildly deficient. Tr. at 258. He opined that she is capable of managing her own benefits. Tr. at 259.

In November 2005, Plaintiff had a disability examination with Arturo Sabio, M.D. Tr. at 261-66. Her chief complaints were obesity, diabetes mellitus, depression, and low back pain. Tr. at 261. Plaintiff reported increased back pain after prolonged sitting of more than 45 minutes or after about 4 hours of riding in a car. Tr. at 262. Plaintiff said she has increased low back pain after walking 500 yards on level ground. Tr. at 262. Plaintiff said she has been depressed for the past one and one-half years. Tr. at 262. She said she has suicidal thoughts and has attempted suicide twice by trying to wreck her car. Tr. at 262. Plaintiff said she feels worthless and does not want to get out of bed but she has refused to be hospitalized. Tr. at 262. She takes medications and sees a counselor every two

weeks. Tr. at 262. She still has suicidal thoughts and she was told to call the crisis hotline when this happens. Tr. at 262. Plaintiff reported that she last worked in June 2004 doing housekeeping at the Days Inn. Tr. at 263. She said she does not see her physician on a regular basis. Tr. at 263.

In December 2005, Joseph A. Shaver, a state agency medical consultant, performed a mental residual functional capacity assessment on Plaintiff. Tr. at 289-92. The medical consultant opined as follows:

> Activities of daily living (ADLs) indicate that Claimant will heat frozen dinners and occasionally prepare a full meal. She does some laundry and housecleaning as well as shops for food and clothes. Claimant pays bills, counts change, and uses a checking account. Claimant appears to be generally credible regarded her reported mental functioning. It is believed that Claimant retains the mental capacity to operate in routine work situations that require decreased production demands and a minimum of social interaction.

Tr. at 291.

### (2) Review of the Record from 2006 through 2007

In February 2006, Plaintiff completed a disability function report. Tr. at 194-201. Plaintiff reported that she lives with a friend. Tr. at 194. She stated that she sleeps most of the day and watches television. Tr. at 194. She said she prepares sandwiches, TV dinners, and other quick meals. Tr. at 196. She said she also does a little laundry and cleaning and shops for food and clothing. Tr. at 196-97. She is able to drive, pay bills, and use a checkbook. Tr. at 197. She said she used to do all kinds of crafts and reading as a hobby but now she does not have any interest in anything. Tr. at 198. She said she does not have problems getting along with other people or authority figures, and she has never been fired for problems with getting along with people. Tr. at 199-200. Plaintiff said she cannot pay attention as long as she used to. Tr. at 199. She reported that she is able to follow written instructions but not as well as before. Tr. at 199. She is able to follow spoken instructions

a little. Tr. at 199. She said she does not handle stress very well or changes in routine. Tr. at 200. She fears hurting or killing herself. Tr. at 200. Plaintiff reported that her depression was one of the reasons her husband asked her to leave. Tr. at 201.

In March 2006, Plaintiff had an evaluation in Braxton County with David P. Peasak, a nurse practitioner. Tr. at 318. She reported that she was doing well and feels stable on her medications. Tr. at 318. Plaintiff said her anxiety is under control with Xanax, and she uses the Klonopin for panic attacks. Tr. at 318. She said it took her four months to go through a 30 day supply of medication. Tr. at 318.

In May 2006, Plaintiff had an assessment with Mary Hopkins, a case manager for the United Summit Center. Tr. at 315-17. Psychologist Joe Richards also signed the report. Tr. at 317. Plaintiff reported a history of mild, passive suicidal ideations, trouble with sleep, poor appetite, and loss of interest in activities. Tr. at 315. Plaintiff said she currently has no suicidal ideations. Tr. at 316. The staff at United Summit Center diagnosed Plaintiff with a GAF of 45 due to her inability to provide for herself independently and care for a home of her own. Tr. at 316. They also found that Plaintiff has difficulty in maintaining relationships with others. Tr. at 316.

In September 2006, Plaintiff had a review assessment with United Summit Center. Tr. at 440. Plaintiff said her husband left her for her best friend and married her best friend not long after the divorce was final. Tr. at 440. She said this made her depressed but she is dealing with it the best way she knows how. Tr. at 440. She reported decreased sleep, anxiety, hopelessness, panic, agitation, and loss of interest in activities. Tr. at 440. She said she mostly stays home with her friend, who was widowed this past year. Tr. at 440. At the assessment, Plaintiff was well-groomed, oriented, cooperative, and made good eye contact. Tr. at 440.

In October 2006, Plaintiff's friend that she lives with, Vada Marks, wrote a letter stating that she supports Plaintiff financially. Tr. at 212.

On December 6, 2006, Plaintiff had an evaluation with nurse practitioner Peasak. Tr. at 439. He assessed Plaintiff with recurrent depression with mood liability and anxiety and personality disorder, not otherwise specified. Tr. at 439.

On December 6, 2006, Plaintiff had a review assessment with United Summit Center. Tr. at 438. Plaintiff reported that she is doing well but has moderate depression, anxiety, and agitation. Tr. at 438. Plaintiff had good dress, grooming, and hygiene. Tr. at 438. She was oriented, cooperative, had no lethal ideations, and made good eye contact. Tr. at 438.

On March 28, 2007, Plaintiff had an evaluation with nurse practitioner Peasak. Tr. at 437. He noted Plaintiff's last evaluation was on December 6, 2006. Tr. at 437. Plaintiff said she is doing relatively well, but she has bouts of depression and irritability. Tr. at 437. She reported some passive suicidal thoughts but no intent on following through. Tr. at 437. The nurse practitioner assessed Plaintiff with recurrent depression with mood liability, anxiety disorder, not otherwise specified, and personality disorder, not otherwise specified. Tr. at 437. The nurse practitioner recommended continued medication and advised her of the crisis line if she should get to the point where she wants to hurt herself. Tr. at 437.

On April 13, 2007, Plaintiff completed a Daily Activities Questionnaire. Tr. at 218-22. Plaintiff said once weekly she does light cleaning, and monthly she does some grocery shopping. Tr. at 218. She said once weekly she cooks a quick meal such as a hotdog or sandwich. Tr. at 219. Plaintiff reported that she is able to care for all of her personal needs. Tr. at 219. She wrote that she listens to country music, watches television, and sleeps most of the time. Tr. at 219. She said she had

trouble getting along with supervisors and / or co-workers because she felt that what work she had to do "wasn't good enough." Tr. at 222. She said she had trouble completing assigned work because her depression became worse and her daily job became nerve wrecking. Tr. at 222. She wrote that her depression affected her job because she "couldn't accept changes." Tr. at 222.

On April 20, 2007, Plaintiff's attorney referred her for an evaluation with Jerry Spiegler, a supervised psychologist. Tr. at 461-65. Timothy Saar, Ph.D., a licensed psychologist, also signed the report. Tr. at 465. Plaintiff said that she dropped out of school in the ninth grade but later obtained her high school diploma while her husband was stationed in the military. Tr. at 461. She was not in any special education classes in school. Tr. at 461. Plaintiff reported that she was angry and frustrated that her husband divorced her and established a relationship with her best friend. Tr. at 462. She said she has passive suicidal ideation (without a plan), and at such times, she calls a crisis hot line, speaks with her friend, or calls her case manager. Tr. at 462-63. Mr. Spiegler IQ tested Plaintiff and reported borderline intellectual functioning with a verbal IQ of 73; a performance IQ of 77; and a full scale IQ of 73. Tr. at 463 & 465.

On May 3, 2007, Mr. Spiegler, a supervised psychologist, and Dr. Saar, a licensed psychologist, completed a psychiatric review technique and mental residual functional capacity assessment. Tr. at 447-60 & 466-71.[1] The psychologists found that Plaintiff had a "mild" restriction on activities of daily living; a "moderate" restriction in maintaining social functioning; a "moderate" restriction in concentration, persistence, or pace; and no episodes of decompensation. Tr. at 457. The

---

[1] The psychiatric review technique is marked as undated. Tr. at 447. However, it appears that the psychologists completed the form on the same date as the mental residual functional capacity assessment since the facsimile headers are from the same date on both documents, Plaintiff's name and social security number are printed in the same manner on both documents, and it appears the psychologists started writing "5" to signify "May" in the date box on page 447. *See* Tr. at 447-60 & 466-71.

psychologists found that Plaintiff meets the "C" criteria of 12.04 (Affective Disorders) due to one or more years inability to function outside of a highly supportive living arrangement with an indication of need for such an arrangement. Tr. at 458. The psychologists opined that Plaintiff has "no limitations" to understand and remember short, simple instructions or to ask simple questions or request assistance from coworkers or supervisors. Tr. at 467-68. The psychologists found that Plaintiff has "mild" limitations to carry out short, simple instructions; to exercise judgment or make simple work-related decisions; and to respond to changes in the work setting or work processes. Tr. at 467 & 469. The psychologists found that Plaintiff has "moderate" limitations to sustain concentration for extended periods; maintain regular attendance and punctuality; interact appropriately with the public; and to tolerate ordinary work stress. Tr. at 467-68 & 470. The psychologists opined that Plaintiff has a "marked" ability to understand and carry out detailed instructions; to complete a workday without interruptions from psychological symptoms; to respond to criticism from supervisors; and to travel independently in unfamiliar places. Tr. at 467-69. The psychologists noted that Plaintiff is unable to sustain work activities "due to borderline intellect and mood disorder refractory to treatment." Tr. at 468.

On May 8, 2007, Urlin D. Matthews, II, a physician assistant specializing in family practice, completed a primary care physician questionnaire regarding Plaintiff. Tr. at 473-80. Mr. Matthews reported that he was Plaintiff's treating physician and that he last examined Plaintiff in October 2006. Tr. at 473. He noted that the United Summit Center was treating Plaintiff for her complaints of recurrent depression, anxiety disorder, and personality disorder. Tr. at 474. Mr. Matthews found that Plaintiff could perform light work with a significant amount of walking and standing and lifting 10 pounds frequently and up to 20 pounds occasionally, or sitting most of the time pushing and

pulling. Tr. at 475. Mr. Matthews found that Plaintiff could not perform sedentary work consisting of sitting most of the time, walking and standing occasionally, and lifting no more than 10 pounds. Tr. at 475. Mr. Matthews found that Plaintiff could stand and walk for one hour at a time and that Plaintiff could alternate between standing and walking for 8 hours. Tr. at 475. He noted that Plaintiff has mild to moderate pain and does not need any assistive devices to walk. Tr. at 477. Mr. Matthews reported that 80% of Plaintiff's health problems are directly or indirectly related to her morbid obesity. Tr. at 478 & 480. Mr. Matthews concluded that Plaintiff is capable of performing a full-time job, 8 hours per day, 5 days per week, on a sustained basis. Tr. at 479.

On May 9, 2007, at the ALJ hearing, Plaintiff testified that she rents a room from Vada Marks, a female friend. Tr. at 58. On "good" days she can be on her feet for four hours and will do little cooking or housecleaning like sweeping the floor, go to the grocery store, and walking a little bit (500 to 1000 yards). Tr. at 63-65 & 73. Plaintiff said that on bad days she can be on her feet for two and one-half to three hours. Tr. at 73. Plaintiff said that most of the time she just sleeps and does not want to "face the world." Tr. at 63. Plaintiff said she cries three or four times a week. Tr. at 66. She said she withdraws from a lot of people and says away from a crowd of visitors. Tr. at 66-67. She testified that she stays in her room or sleeps 50 percent of the time. Tr. at 68. Plaintiff reported that she is 5 feet, 4 inches tall; that she lost 20 pounds last month due to poor appetite; and that she now weighs 274 pounds. Tr. at 58 & 68-69. Plaintiff said she has trouble bending or lifting, and she can only sit for one-half hour before her legs start going numb. Tr. at 70. Plaintiff said she can only lift five pounds. Tr. at 70.

b.    **ALJ Conclusion Regarding whether Plaintiff Meets the "C" Criteria for 12.04 (Affective Disorders)**

Plaintiff contends that she meets the "C" criteria for listing 12.04 (Affective Disorders) due to evidence of episodes of decompensation and living in a highly structured and directing household. Pl. Doc. 10 at 4-8.

> **12.04 Affective Disorders...Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities**, with symptoms or signs currently attenuated by medication or psychosocial support, **and one of the following**: **1.** Repeated episodes of decompensation, each of extended duration; or **2.** A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; **or 3.** Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.
>
> *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04 (Affective Disorders) (emphasis added).
>
> **Episodes of decompensation** are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by **difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace.** Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two). Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., **hospitalizations, placement in a halfway house, or a highly structured and directing household**); or other relevant information in the record about the existence, severity, and duration of the episode...
>
> *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00 (Mental Disorders) (emphasis added).

Following a review of the record and Plaintiff's daily activities, the ALJ found that Plaintiff

does not meet the "C" criteria for 12.04 (Affective Disorders). Tr. at 42-48. The ALJ found that Plaintiff has mild limitations in activities of daily living. Tr. at 43. The ALJ noted that Plaintiff takes care of her own personal needs, does some household chores, prepares simple meals, shops, and drives. Tr. at 43 & 46. The ALJ noted that Plaintiff can ride in a car up to four hours at a time, that she can walk up to 500 yards, that she regularly visits friends and family, and that she volunteers at an elementary school in their store and at parties. Tr. at 43 & 46. Plaintiff testified that even on bad days she can stay on her feet up to three hours a day. Tr. at 46 (ALJ decision); Tr. at 73 (ALJ hearing). The ALJ noted that Plaintiff has not required any psychiatric hospitalizations; her anxiety was under control with medication (it took her four months to go through a thirty day supply); and her depression was deemed stable. Tr. at 46. The ALJ concluded that there is no evidence of decompensations of extended periods, and that there is no evidence of the presence of "C" criteria for 12.04 (Affective Disorders). Tr. at 43.

Plaintiff contends that the ALJ gave insufficient reasons for rejecting the assessment by nurse practitioner Peasak and psychologists Spiegler and Saar. Pl. Doc. 10 at 4, 10, & 12-13.

> Courts evaluate and weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist. 20 C.F.R. § 404.1527. Courts often accord "greater weight to the testimony of a treating physician" because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant. The ALJ is not required in all cases to give the treating physician's opinion greater weight than other evidence; rather, "the ALJ holds [the] discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).

*Johnson v. Barnhart*, 434 F.3d 650, 654 & n.5 (4th Cir. 2005). The ALJ found that medical opinions

of treating physicians are entitled to appropriate consideration if they are well-supported and consistent with other evidence. Tr. at 47. The ALJ found that the Saar opinion, with regard to marked limitations in some areas of function, is inconsistent with the generally normal findings on mental status examinations, the nature of her medical care, and with Plaintiff's own admitted activities. Tr. at 47. Therefore, the ALJ afforded limited weight to the Saar opinion.

From the evidence in the record, substantial evidence supports the ALJ's finding that Plaintiff does not meet the "C" criteria for 12.04 (Affective Disorders); and that Plaintiff does not meet the criteria for a listing level mental impairment.

### c.   New Evidence Submitted to the Appeals Council following the ALJ Decision

On May 22, 2007, the ALJ issued his decision in this case, denying Plaintiff's disability application. Tr. at 49.

On May 23, 2007, Plaintiff had a medical evaluation with nurse practitioner Peasak. Tr. at 487. The nurse practitioner found that Plaintiff was doing a little better and was appropriately clean, groomed, and dressed. Tr. at 487. He noted that she was cooperative and pleasant with fair eye contact. Tr. at 487. Her speech was spontaneous and unpressured; her thought processes were logical; and her thought content was without any harmful or psychotic thoughts. Tr. at 487. Plaintiff reported that she was eating and sleeping well. Tr. at 487. The nurse practitioner noted that Plaintiff will continue medication, case management, and therapy, and that he would see her back in two months, or sooner if needed. Tr. at 487.

On May 24, 2007, Joe Richard, Ed.D., completed a mental residual functional capacity assessment on Plaintiff. Tr. at 17-36. Dr. Richard found that Plaintiff had repeated episodes of decompensation, each of extended duration, but he did not indicate whether or not Plaintiff satisfies

the "C" criteria for listing 12.04. Tr. at 34. However, Dr. Richard did conclude that Plaintiff does not meet the "C" criteria for listing 12.06 (Anxiety Related Disorders). Tr. at 34.

On June 7, 2007, Plaintiff appealed the decision of the ALJ to the Appeals Council, and she submitted the May 2007 evidence from nurse practitioner Peasak and Dr. Richard with her appeal. Tr. at 14.

Plaintiff contends that the evaluation by nurse practitioner Peasak and the assessment by Dr. Richard is new and material evidence and the Appeals Council should have remanded the case to the ALJ. Pl. Doc. 10 at 7 & 13.

"Evidence is new within the meaning of this section if it is not duplicative or cumulative...[e]vidence is material if there is a reasonable possibility that the new evidence would have changed the outcome." *Wilkins v. Secretary, Dept. of Health and Human Services*, 953 F.2d 93 (4th Cir. 1991).

The Court finds that the evaluation by nurse practitioner Peasak and the assessment by Dr. Richard were merely cumulative and would not have changed the ALJ's decision and therefore do not warrant a remand.

### * Residual Functional Capacity Assessment *
### (Needs to be Determined Before Proceeding to Step Four)

> If your impairment(s) does not meet or equal a listed impairment, we will assess and make a finding about your residual functional capacity based on all the relevant medical and other evidence in your case record...We use our residual functional capacity assessment at the fourth step of the sequential evaluation process to determine if you can do your past relevant work...and at the fifth step of the sequential evaluation process (if the evaluation proceeds to this step) to determine if you can adjust to other work...

> Residual functional capacity assessment. Your impairment(s), and any related symptoms, such as pain, may cause physical and mental

limitations that affect what you can do in a work setting. Your residual functional capacity is the most you can still do despite your limitations. We will assess your residual functional capacity based on all the relevant evidence in your case record....

Residual functional capacity is a measurement of the most a claimant can do despite his limitations. *See* 20 C.F.R. § 404.1545(a). According to the Social Security Administration, residual functional capacity is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule. Social Security Regulation (SSR) 96-8p. Residual functional capacity is to be determined by the ALJ only after he considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain). *See* 20 C.F.R. § 404.1529(a).

*See* 20 C.F.R. § 404.1520(e); *see also* 20 C.F.R. § 404.1545(a); *see also Hines v. Barnhart*, 453 F.3d 559 (4th Cir. 2006). The ALJ reviewed Plaintiff's medical evidence, impairments, physical and mental limitations, pain symptoms, daily activities, and credibility; and from the entire record, the ALJ concluded that Plaintiff has the residual functional capacity to perform sedentary work. Tr. at 44.

*Sedentary work* involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

*See* 20 C.F.R. § 404.1567 (italics added). Specifically, the ALJ found that Plaintiff has the residual functional capacity to perform sedentary work, i.e., she can sit for prolonged periods, stand and walk up to two hours overall in an eight-hour day, lift and carry weights of up to ten pounds. She is limited to jobs that do not require more than occasional bending or good depth perception and that do not expose her to hazards such as unprotected heights or dangerous moving machinery.

Nonexertionally, she can understand, remember, and carry out simple instructions and perform work that does not entail more than minimal contact with the public. Tr. at 44.

Plaintiff contends that the ALJ's finding as to her mental residual functional capacity is not supported by substantial evidence. Pl. Doc. 10 at 8-13. The ALJ found as follows:

> [D]espite her symptoms, in her written statements the claimant allowed that she can pay attention for 30 minutes at a time and that she has a good ability to understand and follow instructions and get along with authority figures; and she informed treating and consulting sources that she visits friends and family members on a regular basis and volunteers at school in their store and for parties. Those findings and activities serve to convince the undersigned that the claimant's mental disorders and related symptoms are not so severe so as to preclude all work related activity. However, giving credence to her subjective complaints the undersigned finds that she is limited to jobs entailing no more than simple job instructions and tasks that do not entail more than minimal interaction with the public.

Tr. at 46. The medical history and review of the record provides substantial evidence to support the ALJ's residual functional capacity assessment that Plaintiff can perform sedentary work.

### 4. Step Four: Compare Residual Functional Capacity Assessment to Determine whether the Plaintiff Can Perform Past Relevant Work

> At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work.
> 20 C.F.R. § 404.1520(a).

> Past relevant work is work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it.
> 20 C.F.R. § 404.1560(b).

> Your impairment(s) must prevent you from doing your past relevant work. If we cannot make a determination or decision at the first three steps of the sequential evaluation process, we will compare our residual functional capacity assessment...with the physical and mental demands of your past relevant work. (See § 404.1560(b).) If you can still do this kind of work, we will find that you are not disabled.
> *See* 20 C.F.R. § 404.1520(f).

The ALJ found that Plaintiff is unable to perform her past relevant work as a hotel housekeeper (light, unskilled work) because it exceeds her residual functional capacity. Tr. at 48 (ALJ decision); Tr. at 86 (ALJ hearing). The parties do not dispute the ALJ's findings in Step Four.

**5.      Step Five: Consider Residual Functional Capacity Assessment, Age, Education, and Work Experience to Determine if the Plaintiff Can Perform Any Other Work**

At the fifth and last step...

[i]f we find that your residual functional capacity is not enough to enable you to do any of your past relevant work, we will use the same residual functional capacity assessment we used to decide if you could do your past relevant work when we decide if you can adjust to any other work. We will look at your ability to adjust to other work by considering your residual functional capacity and your vocational factors of age, education, and work experience. Any other work (jobs) that you can adjust to must exist in significant numbers in the national economy (either in the region where you live or in several regions in the country).

*See* 20 C.F.R. § 404.1520(a); *see also* 20 C.F.R. § 404.1560(c). At the final step of the disability analysis, the ALJ considered Plaintiff's age, education, work experience, residual functional capacity assessment, and vocational expert testimony to determine whether Plaintiff can perform any other work. The ALJ noted that Plaintiff was 45 years old during the period at issue, which makes her a younger individual as defined in the Social Security Act. Tr. at 48. *See* 20 C.F.R. § 404.1563 (age as a vocational factor). The ALJ found that Plaintiff has a high school education and transferability of job skills is not material to the determination of disability. Tr. at 48. *See* 20 C.F.R. § 404.1564 (education as a vocational factor); *see also* 20 C.F.R. § 416.968(d) (transferability of job skills).

Vocational Expert Eugene Czuczman testified that someone with Plaintiff's residual functional capacity and work skills would be able to perform "sedentary" jobs such as plastic design

applier, laminator, and patcher. Tr. at 85-87. Mr. Czuczman stated that there were at least 900 of these types of jobs available regionally and 200,000 available nationwide. Tr. at 85.

After considering the Plaintiff's age, education, work experience, residual functional capacity assessment, and vocational expert testimony, the ALJ found that there are jobs that exist in the national economy that the Plaintiff can perform. Tr. at 49. Substantial evidence supports the ALJ's decision that Plaintiff could can sedentary work.

> Substantial evidence...consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance...Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment...if the decision is supported by substantial evidence. *See Laws*, 368 F.2d at 642; *Snyder*, 307 F.2d at 529. **Ultimately, it is the duty of the administrative law judge reviewing a case, and *not* the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence.** *King*, 599 F.2d at 599. "This Court does not find facts or try the case *de novo* when reviewing disability determinations." *Seacrist*, 538 F.2d at 1056-57; "We note that it is the responsibility of the [Commissioner] and not the courts to reconcile inconsistencies in the medical evidence, and that it is the claimant who bears the risk of non-persuasion." *Blalock*, 483 F.2d at 775. **"The language of the Social Security Act precludes a *de novo* judicial proceeding and requires that the court uphold the decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'"**

*See Hays*, 907 F.2d at 1456 (emphasis added). Therefore, this reviewing Court will uphold the ALJ's decision that Plaintiff can perform sedentary work because it is supported by substantial evidence.

In conclusion, the ALJ found that based on the Plaintiff's application filed on August 4, 2005, the Plaintiff is not entitled to a period of disability or supplemental security income. Tr. at 49. The Court finds that substantial evidence supports the ALJ's decision that Plaintiff is not disabled and can perform work in the national economy.

### III.     RECOMMENDATION AND CONCLUSION

The undersigned Magistrate Judge hereby **RECOMMENDS** that the District Court **GRANT** Defendant's Motion for Summary Judgment **[13]**, **DENY** Plaintiff's Motion for Summary Judgment **[10]**, and **AFFIRM** the Decision of the Administrative Law Judge.  The Court notes the Plaintiff's objections to the ruling.

Within fourteen (14) days of receipt of service of this Report and Recommendation, any counsel of record may file with the Clerk of the Court any written objections to this Report and Recommendation. The party should clearly identify the portions of the Report and Recommendation to which the party is filing an objection and the basis for such objection. The party shall also submit a copy of any objections to the District Judge. Failure to timely file objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon this Report and Recommendation. 28 U.S.C. § 636(b)(1).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

**DATED: April 22, 2010**

DAVID J. JOEL
UNITED STATES MAGISTRATE JUDGE